**CARVEL CORPORATION,**
Plaintiff–Appellee,

v.

**DIVERSIFIED MANAGEMENT
GROUP, INC.,**
Defendant–Appellant.

**No. 137, Docket 90–7248.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1990.

Decided April 11, 1991.

Brendan T. Byrne, Roseland, N.J. (David R. Cosgrove, Robert C. Tyms, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, N.J., Eric B. Kavier, Yonkers, N.Y., of counsel), for plaintiff-appellee.

Donald W. O'Brien, Jr., Rochester, N.Y. (Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, N.Y., of counsel), for defendant-appellant.

Before OAKES, Chief Judge, PIERCE and WINTER, Circuit Judges.

PIERCE, Senior Circuit Judge:

Defendant-appellant Diversified Management Group, Inc. ("DMG") appeals from a $1,300,000 judgment in favor of plaintiff-appellee Carvel Corporation ("Carvel") on its breach of contract claim entered in the United States District Court for the Southern District of New York (Lee P. Gagliardi, *Judge*) after a four-day jury trial. DMG also appeals from a memorandum decision in which the district court denied DMG's motions for judgment notwithstanding the verdict or alternatively for a new trial. The principal questions on appeal are whether the district court erred in refusing DMG's request to charge the jury on the implied duty of good faith under New York law and whether DMG was entitled to judgment n.o.v. because Carvel failed to show that it gave DMG notice and an opportunity to cure before it allegedly terminated the parties' agreement. For the reasons set forth below, we reverse and remand.

## BACKGROUND

Carvel is a Delaware corporation in the business of marketing licenses to sell ice cream under its trademarks and trade names. On December 28, 1984, DMG, a Maryland corporation, became a distributor and sub-franchisor for Carvel upon the execution of a Carvel National Area Distributor Agreement and several related agreements.

The distributorship agreement, *inter alia,* called for DMG to serve as Carvel's distributor in Virginia, Maryland, Delaware, West Virginia and the District of Columbia, to service existing Carvel franchisees within its territory and to seek out new store locations and franchisees. The agreement further provided that DMG would pay Carvel a distributorship fee of $1,745,000 and that DMG would receive commissions on Carvel's sales of ice cream mix and equipment to existing franchisees and a portion of the equipment purchase price paid to Carvel by new franchisees.

DMG paid Carvel $375,000 as a partial down payment on the distributorship fee and financed the balance with three promissory notes in the sums of $200,000, $265,000 and $880,000, executed by DMG on December 28, 1984. Pursuant to the promissory notes and associated note agreements, DMG was to make monthly installment payments on each of the notes, beginning respectively on December 15, 1985, January 1, 1986, and January 1, 1988. According to the district court, "DMG never made these payments, abandoned the distributorship and terminated the distributorship agreement, and Carvel ceased making compensation payments to DMG."

Carvel sued DMG in state court, and in October 1986, the action was removed to federal court on the basis of diversity jurisdiction. Carvel alleged that DMG had failed to comply with certain provisions of

the distributorship agreement as well as the promissory notes and accompanying note agreements. DMG counterclaimed, alleging that Carvel was itself in breach of the agreement in failing to pay compensation to DMG, that Carvel had induced DMG to enter into the agreement by certain false promises and misrepresentations made with the intent to deceive DMG, and that Carvel had demonstrated bad faith in its dealings with DMG.

In April 1989, Carvel moved for partial summary judgment. Judge Stanton, the district judge to whom the case was initially assigned, granted the motion with respect to DMG's second and third affirmative defenses based on equitable estoppel and waiver, which were dismissed. He denied the motion with respect to certain claims and counterclaims, finding sufficient issues as to material facts to require resolution at trial.

Thereafter, the case was transferred from Manhattan to White Plains and was reassigned to Judge Gagliardi. A four-day jury trial was held in June 1989. The jury returned a verdict in favor of Carvel on its breach of contract claim, awarding it $1,300,000 in damages, and against DMG on its counterclaims of fraud and breach of contract. Following the entry of judgment, DMG timely moved for judgment notwithstanding the verdict or in the alternative for a new trial, pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure. On February 13, 1990, Judge Gagliardi denied the motions. This appeal followed.

## DISCUSSION

■ DMG contends that the district court erred in refusing to give an instruction to the jury that Carvel had a duty to perform in good faith and that this error warrants a new trial. In his opinion denying DMG's post-trial motions, Judge Gagliardi found no error in refusing to give the requested charge, concluding that DMG presented insufficient evidence at trial to warrant the charge and, alternatively, the duty of good faith was encompassed in the court's general instructions on breach of contract and fraud. In our view, DMG was entitled to the requested good faith charge, and we do not believe that the court's breach of contract and fraud instructions sufficiently incorporated the implied covenant of good faith.

■ The distributorship agreement provides that it shall be construed in accordance with New York law. Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 684, 363 N.E.2d 573, 577, 394 N.Y.S.2d 867, 871 (1977); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329, 333, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *see also* Restatement (Second) of Contracts § 205 (1981). This covenant includes "an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Grad v. Roberts*, 14 N.Y.2d 70, 75, 198 N.E.2d 26, 28, 248 N.Y.S.2d 633, 637 (1964).

■ DMG claims that Carvel, in its dealings with DMG, unjustifiably frustrated DMG's efforts to perform under the distributorship agreement and thus breached the implied duty of good faith. A litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court. *Oliveras v. United States Lines Co.*, 318 F.2d 890, 892 (2d Cir.1963). "It does not matter that the evidence was minimal or was presented in a piecemeal fashion. All that is necessary is that there be some evidence supporting a party's theory of the case." *Hilord Chem. Corp. v. Ricoh Electronics, Inc.*, 875 F.2d 32, 38 (2d Cir.1989). We believe that DMG presented sufficient evidence to support a charge on the implied duty of good faith.

The evidence presented by DMG purportedly showing Carvel's bad faith included Carvel's rejection of proposed store locations and franchisees, refusal to allow changes in store blueprints to accommo-

date Maryland Health Department requirements, and apparently abrupt and unexplained decisions to reverse wholesale sales and advertising policies. While the distributorship agreement gave Carvel considerable discretion with regard to advertising, store location, wholesale sales, and other matters, this did not relieve Carvel of its duty to act in good faith. *See Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989) ("Since the duty of good faith and fair dealing is implied in every contract, contracting parties' fields of discretion under a contract are bounded by the parties' mutual obligation to act in good faith.").

■ Having found that DMG was entitled to the requested charge, we must decide whether the district court's refusal to give the charge was prejudicial error. As a general rule, we will not upset a judgment because of an error in jury instructions if the charge actually given was correct and sufficiently covered the essential issues. *See Hilord Chem. Corp.,* 875 F.2d at 39; *Oliveras,* 318 F.2d at 892. The district court alternatively held that there was no prejudice because "even if there had been sufficient evidence, the refusal to charge was not error insofar as the duty of good faith was encompassed in this court's instructions on breach of contract and fraud."

In our view, DMG was prejudiced by the court's failure to give the requested instruction on the implied duty of good faith. In particular, we disagree with the district court that the law on the implied duty of good faith was "encompassed" in the court's general instructions on breach of contract and fraud.

The court's general breach of contract charge reads in relevant part as follows:

defendant asserts that plaintiff breached the contract by failing to pay compensation owed defendant under the terms of the agreement; that plaintiff did not abide by the terms of its standard operating procedures with respect to organizational or institutional, or O & I sales; that plaintiff refused approval for sites and licensees in violation of the agree-

ment; and that plaintiff withdrew support for the local advertising program in violation of the agreement.

Now, a breach to be material is material only if it goes to the heart of the contract. The defendant must prove all of the elements of the counterclaim by a preponderance of the evidence as I explained it to you previously. If you find that plaintiff breached the contract in any of the above respects, then the verdict will be for the defendant on its counterclaim.

Nothing in this instruction informed the jury that Carvel was under a duty to perform the contract in good faith and that a failure to do so could be considered a material breach. Similarly, the standard fraud instruction given by the court did not by any reasonable interpretation inform the jury of Carvel's implied duty to act in good faith.

Under the circumstances, a simple, direct instruction on the implied duty of good faith was called for; a "subsumed" good faith charge was not sufficient. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2556 (1971) ("As against a more general or abstract charge, a party is entitled to a specific instruction on his theory of the case, if there is evidence to support it and if a proper request for such an instruction has been made."). Without this specific guidance from the court, the jury was left with no legal context in which to assess the significance of the bad faith evidence offered by DMG. *See, e.g., Posttape Assocs. v. Eastman Kodak Co.,* 537 F.2d 751, 757 (3d Cir.1976) (prejudicial error in failure to charge jury that certain individual's statements were attributable to corporate plaintiff; "[t]he court's failure to enlighten the jurors on this point gave them no standard by which to evaluate [the] statements or to determine their relevance to the case").

The breach of contract instruction given was also potentially misleading in several respects. First, the charge states that DMG asserts that Carvel breached the agreement by, *inter alia,* failing to pay compensation, refusing qualified licensees

and withdrawing support for the local advertising program. This appears to be a mischaracterization of DMG's claim as set forth in its third counterclaim. More accurately stated, DMG's essential assertion is that Carvel breached the agreement by breaching the duty of good faith and fair dealing, not by each of the specific acts enumerated. These acts were offered more particularly as *evidence* of Carvel's bad faith. Since the contract gave Carvel considerable discretion with regard to matters like advertising campaigns, store location and wholesale sales, the jury, as instructed, could have mistakenly believed that Carvel was not in breach because it had near absolute control over these matters. However, even if it acted within the bounds of its discretion, Carvel would be in breach if it acted unreasonably.

Further, the charge was misleading in asserting that to be material, the breach must go to the "heart of the contract." While this was a fair general statement of a basic contract law principle, in the context of a claim based on the implied duty of good faith, without more, it was inadequate. The "heart" of the distribution agreement made no express reference to the good or bad faith of the parties. Carvel could have been found in material breach, nonetheless, if the jury had found it to have breached the *implied* duty of good faith. We believe the charge given could easily have confused the jury on this important point.

■ When jury instructions, taken as a whole, give the jury a misleading impression or inadequate understanding of the law, a new trial is warranted. *Plagianos v. American Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir.1990). Accordingly, for the above reasons, we reverse the judgment and remand for a new trial.

■ DMG also contends on this appeal that the district court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict, pursuant to Fed.R.Civ.P. 50(a) and (b). In reviewing the district court's denial of judgment n.o.v., we apply the same standard of review as the district court: the jury's verdict cannot be disturbed unless we can say, without considering either the credibility of witnesses or otherwise considering the weight of the evidence, that the only result a reasonable factfinder could have reached is one in favor of the appellant. *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 541 (2d Cir.1989); *see also County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir.1990) ("Judgment n.o.v. may be granted only when the movant's evidence is so overwhelming that a reasonable jury could only have reached the opposite result."). We agree with the district court that DMG has not met this "appropriately strict" standard. *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988), *cert. denied*, 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989).

DMG's motions for a directed verdict and judgment n.o.v. were based on a claim that the promissory notes were interdependent with the distributorship agreement, which required that DMG be given notice and the opportunity to cure certain defaults within thirty days before Carvel could terminate the agreement.[1] DMG claims that Carvel never gave it notice or an opportunity to cure any default caused by its failure to make payments on the promissory notes and that Carvel's withholding of compensation payments effected a *de facto* termination of the agreement. Therefore, ac-

---

1. Article XIV of the distributorship agreement provides in part:

     The occurrence of any of the following events, if not cured thirty (30) days after written notice of such events from Carvel, constitutes grounds for termination of the Distributorship Agreement:

 \* \* \* \* \* \*

     (d) If Distributor shall fail to remit to Carvel any payments required by the Distributorship Agreement when the same are due
     . . . .

cording to DMG, since Carvel allegedly terminated the agreement without complying with the notice and cure provisions, it was not entitled to recover for breach of the contract as a matter of law.

We agree with DMG that the contemporaneously executed promissory notes and distributorship agreement must be treated as a single contract. The promissory notes were executed for the sole purpose of making payments under the distributorship agreement and the notice and cure provisions of the agreement deal specifically with the consequences of DMG's failure to make timely payments. Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together. *See Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941); *Marsh v. Dodge*, 66 N.Y. 533, 537–38 (1876); *see also National Bank of Watervliet v. Martin*, 203 A.D. 390, 391–92, 196 N.Y.S. 714, 716 (3d Dep't 1922) ("The general rule regarding [promissory] notes and bills of exchange is that contemporaneous agreements affecting such notes or bills must as between parties be read in connection with such instruments."), *aff'd*, 235 N.Y. 611, 139 N.E. 755 (1923). Thus we conclude that Carvel is not entitled to recovery on the promissory notes without reference to the distributorship agreement.[2]

We will assume, as DMG asserts, that Carvel's withholding of compensation payments because of DMG's failure to make payments on the notes constituted a *de facto* termination of the agreement, triggering DMG's rights under the agreement to notice and an opportunity to cure. However, because we find that Carvel effectively complied with the notice and cure provisions under the agreement, we affirm the district court's denial of DMG's motion for judgment n.o.v.

In a letter dated June 9, 1986, Patrick M. Reilly, an attorney in Carvel's legal department, wrote to Joseph Brocato, DMG's president:

> You have not yet made payments on your Promissory Note to Carvel Corporation in the original amount of $200,000 (adjusted principal as of July 1, 1986 is $235,233.78) or on your Promissory Note to Carvel Corporation in the original amount of $265,000 (adjusted principal as of July 1, 1986 is $311,684.75).
>
> .        .        .        .        .
>
> As to the monthly payments for the two Promissory Notes ($3,174.15 and $4,205.74 respectively), these will be debited from monthly compensation payments to you starting July 1, 1986.
>
> This notice may not be construed as a waiver by Carvel Corporation of any default under the Promissory Notes, Agreements, or otherwise and may not be considered a waiver of any other right or remedy.

This letter gave DMG explicit notice of its failure to make payments on the promissory notes. In addition, DMG had more than thirty days from the date of this letter to cure the default by paying the amounts owing on the notes. The *de facto* termination alleged by DMG did not occur until August—when Carvel completely withheld compensation payments, rather than just deducting installment payments due on the promissory notes and paying the balance to DMG. Since DMG had both notice and thirty days to cure the default, Carvel would have been within its rights to terminate the agreement after that point because of DMG's "fail[ure] to remit to Carvel any payments required by the Distributorship Agreement when the same are due."

Accordingly, we conclude that DMG's motions for a directed verdict and for judgment n.o.v. were properly denied.

## CONCLUSION

We have considered DMG's remaining arguments and find them to be without merit. The judgment of the district court

---

**2.** Judge Stanton, who was initially assigned to the case, also reached this conclusion in ruling on Carvel's summary judgment motion. He stated that "[d]espite their facially absolute language, the notes are interdependent with the Distributorship Agreement."

is reversed and the case remanded for a new trial.